IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

KATHERINE SUE STEPHENS,

      **Plaintiff,**

**v.**                                       **Case No.: 3:20-cv-00046**

**ANDREW M. SAUL,**
**Commissioner of the**
**Social Security Administration,**

      **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending are Plaintiff's Brief in Support of Judgment on the Pleadings and the Commissioner's Brief in Support of Defendant's Decision, requesting judgment in his favor. (ECF Nos. 9, 12).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's request for judgment on the pleadings be **DENIED**; the Commissioner's request for judgment on the

pleadings be **GRANTED**; the Commissioner's decision be **AFFIRMED**; and this case be **DISMISSED** and removed from the docket of the Court.

## I.    Procedural History

In January 2011, Katherine Sue Stephens ("Claimant"), completed applications for DIB and SSI, alleging a disability onset date of August 20, 2010 due to "fibromyalgia, irritable bowel syndrome with diarrhea, weak bladder, hyperthyroidism, and depression." (Tr. at 601-14, 669). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 200-03). Claimant requested an administrative hearing, which was held on July 17, 2012 before the Honorable LaRonna Harris, Administrative Law Judge ("ALJ Harris"). (Tr. at 173-99). On August 10, 2012, ALJ Harris issued a written decision, finding that Claimant was not disabled as defined by the Social Security Act. (Tr. at 204-19). Claimant sought review by the Appeals Council, which issued a remand order on December 12, 2013. (Tr. at 220-23). The Honorable Jerry Meade, Administrative Law Judge ("the ALJ") held additional administrative hearings on May 13, 2015 and October 8, 2015. (Tr. at 121-72). On January 7, 2016, the ALJ issued a written decision, concluding that Claimant was not disabled as defined by the Social Security Act. (Tr. at 224-47). Claimant sought review by the Appeals Council, which remanded the ALJ's decision for further review by order dated July 11, 2017. (Tr. at 248-51). The ALJ held three additional administrative hearings on September 21, 2017; March 15, 2018; and March 6, 2019. (Tr. at 53-120). By written decision dated April 24, 2019, the ALJ found that Claimant was not disabled as defined by the Social Security Act. (Tr. at 14-52). The ALJ's decision became the final decision of the Commissioner on November 25, 2019 when the Appeals Council denied Claimant's request for review. (Tr. 1-6).

Claimant timely filed the present civil action seeking judicial review pursuant to 42

U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 7, 8). Claimant filed a Brief in Support of Judgment on the Pleadings, and the Commissioner filed a Brief in Support of Defendant's Decision to which Claimant filed a reply. (ECF Nos. 9, 12, 13). Consequently, the matter is fully briefed and ready for resolution.

## II.    Claimant's Background

Claimant was 43 years old on her alleged onset date and 52 years old on the date of the ALJ's decision. (Tr. at 36). She obtained a general education diploma (GED) and previously worked as a consumer survey interviewer and receptionist/dispatcher for a non-profit organization. (Tr. at 670).

## III.    Summary of ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary, and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability

to do basic work activities." *Id*. If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id*. §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id*. §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id*. §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to

4

determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the four functional areas of understanding, remembering, or applying information; (2) interacting with others; (3) maintaining concentration, persistence, or pace; and (4) adapting or managing oneself will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

5

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2015. (Tr. at 19, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since August 20, 2010, the alleged disability onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "morbid obesity, osteoarthritis, stress fracture of the right ankle (status post open reduction internal fixation (ORIF) and subsequent hardware removal), varus deformity and healed fifth metatarsal fracture of the right foot, status post triple arthrodesis of the right foot, osteopenia, chronic obstructive pulmonary disease (COPD), carpal tunnel syndrome (CTS) (status post release), urinary incontinence, fibromyalgia, depression, bipolar disorder, anxiety, and post-traumatic stress disorder." (Tr. at 19-20, Finding No. 3). The ALJ considered Claimant's gastroesophageal reflux disease (GERD), hypothyroidism and hyperthyroidism, irritable bowel syndrome (IBS), gastritis, cervical and lumbosacral strains, allergies, venous insufficiency/edema, primary biliary cirrhosis/fatty liver, heel spur, plantar fasciitis, and dysphagia, but found that the impairments were non-severe. (Tr. at 20-21). The ALJ further determined that Claimant's hip pain was not a medically determinable impairment. (Tr. at 21).

Under the third inquiry, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 21-24, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to lift and carry up to 20 pounds occasionally and up to 10 pounds frequently. During an eight-hour

6

workday, she can sit a total of eight hours (four hours at a time); can stand and walk a total of eight hours (one hour at a time). She can frequently finger and feel with the non-dominant left hand. She can frequently handle and push/pull with the non-dominant left hand. She can frequently handle and finger with the dominant right hand. She can frequently operate foot controls with both feet. The claimant can never crawl or climb ladders or scaffolds. She can occasionally stoop, kneel, crouch, and climb ramps and stairs. She can frequently balance. She can never be exposed to unprotected heights. She can occasionally be exposed to moving mechanical parts. She can frequently operate a motor vehicle. She must avoid concentrated exposure to irritants such as fumes, dust, odors, gases, and poorly ventilated areas. The claimant can understand, remember, and carry out three-step tasks. She can have frequent changes in the work setting. She can frequently interact with the public, co-workers, and supervisors.

(Tr. at 24-36, Finding No. 5).

At the fourth step, the ALJ determined, with the assistance of a vocational expert ("VE"), that Claimant could perform her past relevant composite job as a dispatcher, secretary, and supervisor. (Tr. at 36, Finding No. 6). The ALJ also found that Claimant's past work skills would transfer to the position of appointment clerk. (Tr. at 36). In the alternative, the ALJ reviewed Claimant's past work experience, age, and education in combination with Claimant's RFC to determine her ability to engage in other substantial gainful activity. (*Id.*). The ALJ considered that (1) Claimant was born in 1967 and was defined as a younger individual on the alleged onset date, but subsequently changed age category to an individual closely approaching advanced age; (2) Claimant had at least a high school education and could communicate in English; and (3) transferability of job skills was not an issue because the Medical-Vocational Rules supported a finding that Claimant was "not disabled," regardless of her transferable job skills. (Tr. at 36-37). Taking into account these factors, Claimant's RFC, and the testimony of a vocational expert ("VE"), the ALJ determined that Claimant could perform other jobs that existed in significant numbers in the national economy, including work as a price marker, package

labeler, routing clerk, table worker, sorter, or final assembler. (Tr. at 37). Consequently, the ALJ concluded that Claimant was not disabled as defined by the Social Security Act and was not entitled to benefits. (Tr. at 38, Finding No. 7).

## IV.    **Claimant's Challenges to the Commissioner's Decision**

Claimant asserts five categories of challenges to the Commissioner's decision. She contends that the ALJ erred in (1) finding that many of her impairments were non-severe, (2) improperly weighing the medical opinions of her treating providers, (3) not considering her obesity, (4) not adopting the VE's testimony that certain work absences and off-task limitations would preclude employment, and (5) not giving proper consideration to the RFC limitations assessed by ALJ Harris. (ECF Nos. 9, 13).

The Commissioner argues that the ALJ appropriately weighed the opinion evidence, reasonably assessed Claimant's non-severe impairments and accounted for them in the RFC assessment, and appropriately considered Claimant's obesity. (ECF No. 12 at 6-16). In addition, the Commissioner contends that the ALJ was not obligated to accept the VE's responses to unsupported hypotheticals and was not bound by the prior ALJ's decision, which was vacated and remanded. (*Id.* at 16-19). The Commissioner notes that, regardless, the ALJ thoroughly considered ALJ Harris' RFC finding and explained why he gave it little weight.

## V.    **Relevant Evidence**

The undersigned has reviewed all of the evidence before the Court. The information that is most pertinent to Claimant's challenges is summarized as follows:

### A. *Treatment Records*

On September 15, 2009, Claimant presented to family nurse practitioner, Sara Lowe, for follow-up regarding her various health conditions, which included

hyperlipidemia, osteoarthritis, hypothyroidism, fibromyalgia, and elevated liver function testing. (Tr. at 1048). She stated that she may need prescription refills, but she had no other complaints. (*Id.*). Claimant denied suffering from any abdominal pain, GERD symptoms, nausea, vomiting, or edema. (*Id.*). Claimant followed up with Nurse Lowe on December 15, 2009. She stated that she was doing "pretty well." (Tr. at 1051). Her only request was that Nurse Lowe increase her dosage of Bentyl because her IBS sometimes "act[ed] up" in the evening, and a second Bentyl tablet significantly helped ease her symptoms. (*Id.*). Claimant denied neck and back pain, joint pain, muscle weakness, and radicular pain. (*Id.*). Claimant again told Nurse Lowe on October 26, 2010 that medication was very helpful in treating her IBS symptoms. (Tr. at 1065).

On January 18, 2011, Claimant reported to Nurse Lowe that she suffered from cough and sinus issues for a month, but she did not have any other complaints. (Tr. at 1067). She denied experiencing back pain, fatigue, or malaise. (*Id.*). Claimant's allergies were "act[ing] up" during a subsequent visit with Nurse Lowe on April 19, 2011, and Nurse Lowe prescribed Clarinex. (Tr. at 901, 902). Claimant's physical examination was normal. (Tr. at 901). During follow-up visits with Nurse Lowe, Claimant denied GERD symptoms on September 20, 2011, and she denied back pain on November 8, 2011 and March 13, 2012. (Tr. at 1084, 1092, 1103).

Judy Watts performed a psychiatric evaluation of Claimant on April 10, 2012. Claimant stated that she was doing better and sleeping better, her mood was fair, and she was trying to apply for a job. (Tr. at 945). Her activities included watching television and walking her dog. (*Id.*). Her sociability, speech, thought content, and motor activity were within normal limits; she was fully oriented; and her eye contact was appropriate. (Tr. at 946-47).

9

On August 7, 2012, Claimant presented to family medicine physician, Adam Franks, M.D. Claimant did not have any symptoms of hypothyroid, GERD, or seasonal allergies while on medications. (Tr. at 1114). Her knees were tender to palpation, and she reported knee pain elicited by motion, but she had full range of motion in her knees and no swelling, effusion, erythema, or instability. (Tr. at 1116). Claimant also had normal motor strength, reflexes, and sensation, as well as a euthymic mood and normal affect. (Tr. at 1117). Dr. Franks noted the same findings during a subsequent examination on November 6, 2012. (Tr. at 1110, 1112, 1113).

The following year, Claimant did not have any edema during her January 21, 2013 visit with gastroenterologist, Yaser Rayyan, M.D. (Tr. at 1198). Regarding IBS, Claimant advised Dr. Franks on February 5, 2013 that she did not have any side effects from Bentyl. She stated that she still had ten loose stools per day, but she experienced less cramping on Bentyl. (Tr. at 1144). Claimant was also taking Ditropan for mixed urinary incontinence without side effects. (*Id*.). She denied urge type symptoms, but she told Dr. Franks that she had some stress incontinence and urine loss upon standing first thing in the morning. (*Id*.). Claimant stated that she was doing Kegel exercises at home. (*Id*.). Claimant's mood was euthymic, and her affect was normal. (Tr. at 1147). During a successive visit with Nurse Lowe on March 13, 2012, Claimant denied fatigue, malaise, weakness, and neck and back pain. (Tr. at 1103). She did not have edema or jaundice during her appointment with gastroenterologist, Yaser Rayyan, M.D., on April 22, 2013. (Tr. at 1185).

Claimant presented to gynecologist and urinary incontinence specialist, Kevin Conaway, M.D., on August 2, 2013. She reported urinary incontinence, abdominal pain, diarrhea, and depression, but she denied fatigue, malaise, and anxiety. (Tr. at 1153). Later

10

that month, on August 23, 2013, Dr. Franks noted that Claimant had no symptoms of hypothyroidism or GERD when taking medications. (Tr. at 1126). Claimant was taking allergy medications without any recent symptoms, but she occasionally experienced rhinitis and cough. (*Id*.). Claimant explained that her allergy symptoms were worse in the winter. (*Id*.). Claimant's knees were again tender to palpation and she reported knee pain with motion, but she did not have any instability, and her motor strength, reflexes, and sensation were normal. (Tr. at 1128). (*Id*.). Claimant displayed a euthymic mood and normal affect. (Tr. at 1129).

On September 13, 2013, Claimant advised Dr. Franks that she had pain when swallowing solid food and pills over the past two months. (Tr. at 1118). She denied nausea, but she reported associated vomiting. (*Id*.). Dr. Franks diagnosed Claimant with chronic reflux esophagitis for which he prescribed medications and referred Claimant to a gastroenterologist for an endoscopy. (Tr. at 1120). Claimant again presented a euthymic mood and normal affect at this visit. (*Id*.). During her September 25, 2013 appointment with Dr. Rayyan, Claimant did not have any evidence of edema or jaundice, and her liver was normal to palpation, not enlarged, tender, or nodular. (Tr. at 1179, 1181).

Claimant presented for a follow-up appointment with Dr. Franks on November 26, 2013. She still did not have any symptoms of hypothyroidism or GERD while on medications; she did not have any recent allergy symptoms; and she exhibited a euthymic mood and normal affect. (Tr. at 1277). Approximately one year later, on February 25, 2014, Dr. Franks noted that Claimant still did not have any symptoms of hypothyroidism or recent allergy symptoms. (Tr. at 1271). However, Claimant complained of seasonal allergies the following month on March 18, 2014. Dr. Franks prescribed a nasal spray and renewed Claimant's prescription for Zyrtec. (Tr. at 1267).

On April 15, 2014, Claimant presented as a new patient to family nurse practitioner, Jeff Kaplan, FNP. She reported suffering from incontinence and overactive bladder during the past year. (Tr. at 1357). Claimant stated that she tried several medications with little improvement. (*Id.*). She was wearing three pull-ups per day for protection. (*Id.*). Claimant's gait and stance were normal. (Tr. at 1359). Nurse Kaplan diagnosed Claimant with a urinary tract infection and prescribed medication. (*Id.*). He also diagnosed her with urinary incontinence, hyperactivity of the bladder, and stress incontinence. (*Id.*). He scheduled a diagnostic cystoscopy and advised Claimant to regularly empty her bladder and avoid bladder irritants such as caffeine, spicy foods, acidic substances, and alcohol. (*Id.*).

Psychiatrist, Mohit Bhardwaj, M.D., examined Claimant at Prestera Center on April 25, 2014. (Tr. at 1293). Claimant reported mental health symptoms, but her mood was fine, and she demonstrated appropriate affect, thought content, eye contact, speech, and motor activity; was alert and cooperative; displayed goal-directed thought processes; and had a normal gait. (Tr. at 1294). Dr. Bhardwaj renewed Claimant's current psychotropic medications. (Tr. at 1296). On May 6, 2014, urologist, Rocco A. Morabito, Jr., M.D., evaluated Claimant's overactive bladder complaints. He recorded that Claimant had urgency incontinence, but minimal stress incontinence. (Tr. at 1364). She used large pads and pull-ups for protection. (*Id.*). Dr. Morabito felt that Claimant would not respond to typical overactive bladder treatment due to her morbid obesity. (*Id.*). He discussed the options available to Claimant, including placement of an InterStim device.[1] (*Id.*).

---

[1] "InterStim Therapy is a reversible therapy that uses an implantable device to send mild electrical pulses to stimulate the sacral nerves. Those nerves control the muscles of the pelvic floor, urinary and anal sphincters, lower urinary tract and colon. The sacral nerves are located just above the tailbone, near the spinal cord." https://denverurology.com/treatments/interstim-therapy/

On May 27, 2014, Dr. Franks again recorded that Claimant did not have any symptoms of hypothyroidism on medication, and she was taking her allergy medication without any recent symptoms. (Tr. at 1261). Dr. Franks noted on July 8, 2014 that Claimant complained of worsening pedal edema in the past month with skin redness and some paresthesias on the right side. (Tr. at 1255). Claimant stated that the swelling became worse as the day progressed, and she did not elevate her feet much during the day, but she did in the evening. (*Id.*). She restricted her salt intake "some," but she did not wear compression hose. (*Id.*). Claimant was 5 feet and 4 inches tall and weighed 331 pounds with a body mass index of 56.82. (Tr. at 1256). Dr. Franks ordered blood work and assessed that the edema was likely due to venous insufficiency related to obesity. (Tr. at 1257). He discussed lifestyle modifications and considered prescribing Lasix. (*Id.*).

Claimant presented to family medicine physician, Jane Donovan, D.O., on July 23, 2014, regarding her worsening edema. Dr. Donovan prescribed Lasix and compression stockings. (Tr. at 1249). She also diagnosed Claimant with plantar fasciitis and advised her to stretch at home, ice her heel, and wear supportive shoes at all times. (Tr. at 1250). Dr. Morabito implanted Claimant's trial InterStim device on August 1, 2014. (Tr. at 1374). Claimant reported during her follow-up visit with Dr. Morabito on August 14, 2014 that she was doing better. (Tr. at 1377). She was wearing one pull-up per day and only going to the bathroom once per night. (*Id.*).

On August 26, 2014, Dr. Franks again documented that Claimant did not have thyroid symptoms while on medication or any recent allergy symptoms. (Tr. at 1239). The "work-up" regarding the swelling in her legs was negative. (*Id.*). She exhibited tenderness to palpation in her lumbosacral spine, but she did not have any muscle spasm, her range of motion was normal, and her straight-leg raising tests were negative. (Tr. at 1241).

Claimant also complained of pain elicited by motion in her left hip, but she did not exhibit tenderness to palpation, her range of motion was normal in her hip, and she did not have any muscle weakness or spasm. (*Id.*). Claimant maintained normal motor strength and deep tendon reflexes, and her sensation was intact. (Tr. at 1242).

Claimant's trial phase of the InterStim therapy was successful with greater than 50 percent improvement. (Tr. at 1382). Thus, Dr. Morabito implanted a permanent InterStim device on September 17, 2014. (*Id.*). On October 8, 2014, Claimant told Dr. Morabito that she "thought that she was better" and was satisfied. (Tr. at 1387). She was wearing one pull-up during the day, as compared to wearing three pull-ups each day before surgery. (*Id.*). Claimant complained of difficulty swallowing to Dr. Rayyan on December 3, 2014. (Tr. at 1449). Dr. Rayyan planned to schedule Claimant for an esophagogastroduodenoscopy (EGD). (Tr. at 1453). In terms of other impairments, Claimant's GERD/gastritis was controlled, and she had normal motor strength in her upper and lower extremities. (*Id.*).

Claimant's examination with Dr. Franks on December 5, 2014 noted the same findings as her prior examinations. She did not have thyroid symptoms or recent allergy symptoms. (Tr. at 1231). She had normal range of motion, motor strength, reflexes, and sensation; she did not have muscle weakness or spasm; and her mood was euthymic with a normal affect. (Tr. at 1233-34). On February 25, 2015, Claimant again told Dr. Morabito that she thought that she was better, and her incontinence symptoms were improved. (Tr. at 1412). However, she was having recurrent urinary tract infections. (*Id.*).

On March 11, 2015, Claimant presented to family nurse practitioner, Jordan Adkins, at Prestera Center. Her gait was steady. (Tr. at 1283). Claimant described her mood as "just sad." (*Id.*). On examination, Claimant had appropriate affect, calm motor

activity, good attention/concentration, normal orientation, and intact thought processes, but her judgment was mildly impaired. (*Id.*). Claimant had normal mood and affect during her gynecological examination with Dr. Conway the following month on April 2, 2015. (Tr. at 1586). On April 14, 2015, Dr. Franks noted the same findings as his recent examinations. (Tr. at 1226, 1229). However, the edema in Claimant's legs was improved in the sense that it now only occurred intermittently. (Tr. at 1226).

Claimant went to the emergency department at Cabell Huntington Hospital on May 27, 2015, complaining of difficulty breathing, coughing, and wheezing. (Tr. at 3267). She did not have any gastrointestinal or musculoskeletal complaints. (*Id.*). Her back was nontender, and she had normal range of motion, strength, sensation, and motor function, as well as appropriate mood and affect. (Tr. at 3270). Her lungs were clear to auscultation, her respirations were unlabored, and her breath sounds were equal. (*Id.*). She was diagnosed with dyspnea and told to follow up with Dr. Franks. (Tr. at 3271-72). On June 26, 2015, Dr. Franks diagnosed Claimant with bronchitis, exacerbation of seasonal allergies, and costochondritis for which he prescribed medications. (Tr. at 1647).

Claimant followed up with Dr. Franks on July 24, 2015. She still did not have any symptoms of hypothyroidism or allergies when using medication. (Tr. at 1631). She was taking Lasix for her intermittent edema, but she was recently out of the medication. (*Id.*). Claimant's range of motion, muscle strength, reflexes, and sensation were normal. (Tr. at 1634). Nurse Adkins recorded that Claimant's gait was unsteady on July 24, 2015. (Tr. at 1537). However, Claimant's mental status examination findings were normal with appropriate affect; calm motor activity; good attention/concentration; normal speech and orientation; intact memory, thought processes, and judgment; and present insight. (Tr. at 1536-37). Nurse Adkins again recorded Claimant's unsteady gait on March 30, 2016,

and she assessed that Claimant had partial insight, but Claimant otherwise had the same normal mental status examination findings as the above-noted visit. (Tr. at 1789-90).

Claimant presented to Dr. Rayyan on June 8, 2016. She was still morbidly obese, and she had +1 edema, but her blood pressure and GERD were well controlled. (Tr. at 1723). Dr. Rayyan adjusted Claimant's medication for esophageal spasm. (Tr. at 1723, 1724). Claimant was tolerating her medication for primary biliary cirrhosis very well and her liver function tests were normal. (Tr. at 1724). On the same date, x-rays were taken of Claimant's feet due to reported pain. The images showed bilateral calcaneal spurs. (Tr. at 3892). However, it was noted that Claimant's plantar fasciitis resolved as of August 26, 2014. (Tr. at 1722).

Claimant presented for her annual gynecological examination with Dr. Conaway on June 30, 2016. She reported anxiety and depression, but denied fatigue, malaise, abdominal pain, diarrhea, or other gastrointestinal symptoms. (Tr. at 1768). Claimant followed up with Dr. Conaway on October 27, 2016. She stated that she had urge incontinence and stated that her InterStim was providing poor symptom control. (Tr. at 1754). Claimant related the same complaints to urologist, Charles S. Woolums, M.D., on November 11, 2016. Claimant was diagnosed with a urinary tract infection that was causing dysuria and bladder pressure. (Tr. at 1909). Claimant reported that she was voiding every 20 minutes and wearing eight pads per day. (Tr. at 1903-04). She denied nausea and vomiting, and her gait, station, judgment, insight, orientation, mood, and affect were normal. (Tr. at 1904, 1907-08). Dr. Woolums turned off Claimant's InterStim device, noting that it probably needed revision. (Tr. at 1909).

Claimant presented to family medicine physician, Clifton Bolinger, M.D., on December 13, 2016. Her hypothyroidism and allergic rhinitis were stable on medications

and she denied related symptoms. (Tr. at 1930). Claimant's GERD and hypothyroidism were likewise clinically stable without symptoms on January 18, 2017, but Claimant reported seasonal allergy symptoms. (Tr. at 1925). Dr. Bolinger discontinued Claimant's prescription for Flonase because it was causing nosebleeds. (Tr. at 1925, 1928-29). Claimant reported continued urge incontinence to Dr. Woolums on February 2, 2017. Dr. Woolums assessed that Claimant's InterStim device was improperly functioning or nonfunctioning. (Tr. at 1897). Dr. Woolums recorded that the device initially provided improvement, but it was no longer improving Claimant's symptoms and he planned to evaluate the device and possibly replace it. (*Id*.). Dr. Woolums removed Claimant's InterStim device on March 13, 2017. (Tr. at 1884). Her gait was normal on that date. (Tr. at 1889).

Claimant reported some allergic rhinitis symptoms to Dr. Bolinger on April 25, 2017, but her hypothyroidism was still clinically stable. (Tr. at 1916). Claimant presented to gastroenterologist, Larry Carter, D.O., on June 9, 2017. She still complained of difficulty swallowing. (Tr. at 1679). Her EGD and dilation were performed in January 2017, but Claimant did not notice much improvement. (*Id*.). Claimant was otherwise tolerating medication for biliary cirrhosis very well and her liver function tests were normal. (Tr. at 1680). Her GERD was also well controlled on medication. (*Id*.). Dr. Carter diagnosed Claimant with dysphagia and chronic reflux esophagitis. (Tr. at 1690). He prescribed Zantac at bedtime and Zofran as needed. (*Id*.).

Claimant advised Dr. Bolinger on September 6, 2017 that her allergic rhinitis was improved and well controlled. (Tr. at 2081). She did not have any significant rhinitis, congestion, postnasal drainage, or cough. (*Id*.). During follow-up with Dr. Carter on October 30, 2017, Claimant still reported dysphasia and burping/hiccups, but she denied

abdominal pain, bloating, or cramps; nausea; vomiting; diarrhea; or constipation. (Tr. at 2027, 2031). Her biliary cirrhosis and GERD remained controlled with medication. (Tr. at 2028). On examination, Claimant demonstrated normal gait, station, stability, judgment, insight, orientation, mood, and affect. (Tr. at 2032). Dr. Carter adjusted Claimant's dysphagia medications. (Tr. at 2034).

On December 6, 2017, Claimant complained of rhinitis, congestion, and postnasal drainage to Dr. Bolinger. (Tr. at 2072). Her physical examination did not reveal any abnormalities. (Tr. at 2074). Dr. Bolinger diagnosed Claimant with allergic rhinitis and discussed the nature and etiology of the condition, including likely triggers and appropriate measures to control symptoms. (Tr. at 2075). He prescribed an oral antihistamine, nasal steroid spray, and Singular. (*Id.*).

On December 12, 2017, Dr. Woolums treated Claimant for a urinary tract infection. (Tr. at 2004). He noted that her gait was normal. (*Id.*). Thereafter, Claimant presented to Dr. Bolinger on February 20, 2018 regarding a COPD flare and possible bronchitis. (Tr. at 2057). Claimant complained of shortness of breath, but she noted that she just left an orthopedic appointment and had walked a lot. (*Id.*). Her oxygen saturation was normal. (*Id.*). On July 5, 2018, Dr. Woolums recorded that Claimant denied suffering from any malaise, nausea, vomiting, abdominal pain, diarrhea, back pain, numbness, anxiety, or depression. (Tr. at 2097-98). Similarly, Dr. Bolinger recorded on September 25, 2018 that Claimant denied having any edema, nausea, diarrhea, constipation, depression, or anxiety. (Tr. at 2108). She had normal gait and full range of motion and body strength. (*Id.*). Claimant was unable to take her Flonase, at times, due to nosebleeds. (*Id.*). Dr. Bolinger assessed that Claimant's allergic rhinitis was "not great," so he added a prednisone "burst," which he stated, "should get her under control again." (*Id.*).

18

### B. Evaluations and Opinions

On February 14, 2011, Lisa C. Tate, M.A., performed a psychological examination of Claimant. Claimant stated that she was five feet and three inches tall and weighed 350 pounds. (Tr. at 860). Her grooming and personal hygiene were good, and she walked with a normal gait and maintained normal posture. (*Id.*). Claimant stated that she suffered from worsening depression since 1998, but she felt that her depression was under control as long as she took her medication. (*Id.*). Her past mental health treatment consisted of therapy for a short period of time eighteen months earlier. (Tr. at 861). Her daily activities included: taking her medication, making her bed, helping her mother with light housework, watching television, washing dishes, playing on the computer online for at least two to three hours per day, and reading. (Tr. at 862). She also vacuumed, cleaned her room, and went to the gas station weekly, and she took her mother to the grocery store twice per week. (*Id.*). On examination, Claimant's insight was fair, and her recent memory and concentration were moderately deficient based on the tests administered during the examination. (Tr. at 861-62). Claimant's orientation, affect, thought processes and content, perception, judgment, immediate and remote memory, and psychomotor behavior were within normal limits. (*Id.*). Ms. Tate diagnosed Claimant with depressive disorder not otherwise specified. (Tr. at 862).

On March 16, 2011, Kip Beard, M.D., performed an Internal Medicine Examination of Claimant. Claimant complained of pain extending from her neck to her hips. (Tr. at 867). She also reported suffering from IBS since her gallbladder surgery in 1985. (Tr. at 868). Claimant alleged that she had diarrhea predictably after every meal, and it occurred approximately eight or nine times per day. (*Id.*). It was associated with some crampy abdominal pain, but no hematemesis, melena, hematochezia, unusual weight changes,

fever, or chills. (*Id*.). Claimant stated that her hypothyroidism was treated with Synthroid, and she did not have any associated symptoms. (*Id*.). Claimant's gait was slightly cumbersome due to her body habitus at five feet and four inches tall and 314 pounds. (Tr. at 869). However, her gait was steady, she did not require any assistive devices, and she arose from her seat and stepped up and down from the examination table without difficulty. (*Id*.). She had no edema or vascular insufficiency. (Tr. at 870). Claimant exhibited some range of motion abnormalities in her neck and back with discomfort, but negative straight leg raising tests and no obvious neurologic comprise related to her neck or back. (Tr. at 871).

On September 19, 2012, psychologist, Rachel Arthur, M.A., examined Claimant at the request of Claimant's attorney. Claimant weighed 355 pounds. (Tr. at 1105). Her gait and posture were unremarkable. (*Id*.). Claimant related that she suffered from depression since she was a teenager, but she experienced symptoms daily for the past three years. (*Id*.). Claimant was receiving counseling at Prestera Center on a monthly basis, which she stated was somewhat beneficial. (*Id*.). She had never been hospitalized for psychiatric reasons. (*Id*.). Claimant's daily activities included light cleaning; watching television; reading; performing self-care independently; cooking simple meals; driving; shopping; handling her finances; and using the computer to play games, browse the internet, and interact with others. (Tr. at 1106). On examination, Claimant's mood was depressed, affect was somewhat restricted, judgment and recent memory were mildly impaired, and concentration was mildly to moderately deficient based on the Digit Span task test. (Tr. at 1107). However, Claimant's attitude/behavior, social interaction, speech, orientation, perception, thought processes, insight, immediate and remote memory, and psychomotor activity were within normal limits. (*Id*.). Ms. Arthur diagnosed Claimant with a single

episode of moderate major depressive disorder and dysthymic disorder. (*Id.*).

On June 29, 2015, psychologist, Jeffrey Fremont, Ph.D., completed a form to assess Claimant's ability to do mental work-related activities based upon his review of Claimant's records. He assessed that Claimant had mild limitation in understanding, remembering, and carrying out simple instructions; interacting with the public, supervisors, and co-workers; and responding appropriately to usual work situations and changes in a routine work setting. (Tr. at 1517-18). Dr. Fremont opined that Claimant had moderate limitation in making judgments on simple and complex work-related decisions and understanding, remembering, and carrying out complex instructions. (Tr. at 1517). The scale provided on the form defined a mild limitation as a slight limitation, but a finding that the individual could generally function well in that area, and a moderate limitation was more than a slight limitation, but the individual could still function satisfactorily. (*Id.*). Dr. Fremont rated Claimant's degree of limitation in the areas of daily living and social functioning as mild; maintaining concentration, persistence, or pace as moderate; and he noted that Claimant had no repeated episodes of decompensation of extended duration. (Tr. at 1522).

Nurse Adkins also completed a form to assess Claimant's ability to do mental work-related activities on October 7, 2015. She assessed that Claimant had significant depression, but Claimant's prognosis was good with medication and therapy. (Tr. at 1566). She opined that Claimant was moderately limited in completing all of the listed work-related activities. (Tr. at 1567). She further assessed that Claimant had marked-to-extreme pervasive loss of interest in almost all activities, decreased energy, mood disturbance, and persistent disturbances of mood or affect. (*Id.*).

On March 28, 2016, Paul W. Craig, II, M.D., completed a social security residual capacity evaluation at the request of Claimant's counsel. (Tr. at 1675). Dr. Craig opined that Claimant was capable of no more than sedentary activity and was completely disabled from all work indefinitely due to her combination of conditions. (*Id*.). He noted that Claimant required a cane for support and balance when ambulating. (*Id*.). Dr. Craig listed that Claimant suffered from primary biliary cirrhosis, bilateral knee osteoarthritis with degenerative changes in the hips and ankles, urinary incontinence, IBS with diarrhea, vitamin D and B-12 deficiencies, GERD with gastritis, hypothyroidism, hypercholesterolemia, severe bilateral carpal tunnel syndrome, and severe depression. (*Id*.). Dr. Craig assessed that Claimant could lift less than 10 pounds; stand or walk for less than two to three hours in a workday, but less than one hour without interruption; sit for two to four hours, but less than one to two hours without interruption; and never perform postural activities. (Tr. at 1676-77). Dr. Craig stated that the foregoing limitations were based on "physical exam history and medical records review." (*Id*.). He marked that Claimant's ability to reach, feel, see, hear, and speak were impacted by her conditions, as well as her ability to be exposed to certain environmental conditions, including heights, moving machinery, temperature extremes, chemicals, humidity, and vibration. (Tr. at 1678).

On July 25, 2017, Dr. Bolinger wrote a letter stating that Claimant was his patient and she was unable to work due to her "multiple health issues." (Tr. at 1747). He stated that her health issues were chronic, and he did "not foresee this changing." (*Id*.).

### C. Claimant's Statements

Claimant testified during her multiple administrative hearings. On May 13, 2015, Claimant stated that she weighed 331 pounds. (Tr. at 148). She alleged that she suffered

from edema in her lower legs and feet daily, although she drove herself to the hearing. (Tr. at 148, 150). On October 8, 2015, Claimant testified that she stopped working due to the stress of doing the job of two people as a dispatcher. (Tr. at 125-26). She weighed 325 pounds during this hearing. (Tr. at 128). Claimant testified that she previously weighed 341 pounds and lost weight through a combination of stress, depression, and her effort to lose weight. (Tr. at 129).

During Claimant's September 21, 2017 hearing, Claimant stated that she had lost 100 pounds in the past year, which she attributed to not being able to swallow food well. (Tr. at 102). She currently weighed 294 pounds. (*Id.*). She had a driver's license and drove twice per week. (Tr. at 104). Claimant stated that she used a cane for the past three years due to knee problems. (Tr. at 109). However, she said that she would not know that she had primary biliary cirrhosis if a physician had not told her. (Tr. at 115). She did not experience any fatigue associated with it. (*Id.*). Claimant also testified that her IBS was controlled with medication. (Tr. at 117).

Claimant testified during her administrative hearing on March 15, 2018 that she weighed 288 pounds, which she again attributed mostly to her dysphagia, which she said caused her to vomit sometimes when she ate solid foods. (Tr. at 85). She also attributed the weight loss to stress and depression. (Tr. at 86). Claimant still regularly drove, and she drove herself to the hearing. (Tr. at 86). Claimant continued to receive mental health treatment at Prestera Center, and it provided some benefit. (Tr. at 88). On March 6, 2019, Claimant testified that she weighed 267 pounds after losing weight due to Lasix. (Tr. at 61). She complained of fatigue, anxiety attacks, and trouble concentrating. (Tr. at 62). Claimant stated that she suffered from pain in her legs, hips, and tailbone, and she had to go to the restroom five to six times each hour due to urinary incontinence. (Tr. at 60, 63)

## VI.    **Standard of Review**

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the record and determine whether it is adequate to support the conclusion of the Commissioner. *Hays*, 907 F.2d at 1456. When conducting this review, the Court does not re-weigh evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001) (citing *Hays*, 907 F.2d at 1456)). Moreover, "[t]he fact that the record as a whole might support an inconsistent conclusion is immaterial, for the language of § 205(g) ... requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" *Blalock*, 483 F.2d at 775 (citations omitted). Thus, the relevant question for the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig*, 76 F.3d at 589).

## VII.    **Discussion**

Claimant challenges the ALJ's analysis of her non-severe impairments, the treating

providers' opinions, her obesity, the VE's testimony, and the prior ALJ's RFC assessment. Each argument is considered below, in turn.

### A.    Non-Severe Impairments

Claimant contends that the ALJ erred in concluding that numerous of her impairments were non-severe, which thereby rendered the RFC and credibility analyses flawed. (ECF No. 9 at 5-6). At the second step of the sequential evaluation process, the ALJ concludes whether the claimant has an impairment or combination of impairments that is severe. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). An impairment is considered "severe" if it significantly limits a claimant's ability to do work-related activities. 20 C.F.R. §§ 404.1522(a), 416.922(a); SSR 96-3p, 1996 WL 374181, at *1. "[A]n impairment(s) that is 'not severe' must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities." SSR 96-3p, 1996 WL 374181, at *1 (citing SSR 85-28, 1985 WL 56856). Examples of basic work activities include: (1) physical functions, such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1522(b), 416.921(b).

Importantly, the claimant bears the burden of proving that an impairment is severe, *Grant v. Schweiker,* 699 F.2d 189, 191 (4th Cir. 1983), and does this by producing medical evidence establishing the condition and its effect on the claimant's ability to work. *Williamson v. Barnhart,* 350 F.3d 1097, 1100 (10th Cir. 2003). The mere presence of a condition or ailment is not enough to demonstrate the existence of a severe impairment.

Moreover, to qualify as a severe impairment under step two, the impairment must have lasted, or be expected to last, for a continuous period of at least twelve months and must not be controlled by treatment, such as medication. *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986). If the ALJ determines that the claimant does not have a severe impairment or combination of impairments, a finding of not disabled is made at step two, and the sequential process comes to an end. On the other hand, if the claimant has at least one impairment that is deemed severe, the process moves on to the third step. "[T]he step-two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen v. Chater,* 80 F.3d 1273, 1290 (9th Cir. 1996) (citing *Bowen v. Yuckert,* 482 U.S. 137, 153-54 (1987)); *see also Felton–Miller v. Astrue,* 459 F. App'x 226, 230 (4th Cir. 2011) ("Step two of the sequential evaluation is a threshold question with a de minimis severity requirement.").

### 1. Chronic cervical and lumbosacral strains

The ALJ noted that Claimant was diagnosed with cervical and lumbosacral strains during her consultative examination in March 2011. (Tr. at 20). However, the ALJ remarked that the impairments were not reflected with any consistency throughout the longitudinal record. (*Id.*). Moreover, the ALJ noted that the consultative examination documented only mild cervical pain and mild lumbar pain with forward bending. (*Id.*). Otherwise, Claimant was routinely negative for cervical and lumbar pain. (*Id.*). The ALJ explained that, although some examinations indicated lumbar tenderness, Claimant had normal range of motion in her spine with negative straight leg raises. (*Id.*). Therefore, the ALJ concluded that Claimant's cervical and lumbosacral strains were non-severe impairments. (*Id.*).

This finding is supported by substantial evidence. Claimant denied neck and back

26

pain, muscle weakness, and radicular pain in December 2009. (Tr. at 1051). During her consultative examination in March 2011, her gait was slightly cumbersome due to her body habitus, but it was steady, and she did not require assistive devices. (Tr. at 869). She arose from her seat and stepped up and down from the examination table without difficulty. (*Id.*). She had some range of motion abnormalities in her neck and back with discomfort, but her straight leg raising tests were negative, and she had no obvious neurologic comprise related to her neck and back. (Tr. at 871). Claimant subsequently denied back pain in November 2011 and March 2012. (Tr. at 1092, 1103). In 2014 and 2015, she had tenderness to palpation in her lumbosacral spine, but no muscle spasm; normal range of motion, motor strength, and deep tendon reflexes; negative straight-leg raising tests; and intact sensation. (Tr. at 1229, 1233-34, 1241-42, 1634). Her gait was normal, steady, and stable in 2017 and 2018. (Tr. at 1889, 2004, 2032, 2108). In September 2018, Claimant had full range of motion and body strength. (Tr. at 2108). Therefore, the undersigned **FINDS** that the ALJ's step two analysis of Claimant's chronic cervical and lumbosacral strains is supported by substantial evidence.

## 2. Hypothyroidism

Regarding Claimant's hypothyroidism, the ALJ noted that Claimant reported to the consultative examiner that she took medication for the condition, and she did not experience any related symptoms to her knowledge. (Tr. at 20). Claimant's clinical records indeed consistently documented that Claimant's hypothyroidism was asymptomatic and stable on medication. (Tr. at 868, 1110, 1114, 1126, 1226, 1231, 1239, 1261, 1271, 1631, 1916, 1925, 1930). Therefore, the undersigned **FINDS** that the ALJ's step two analysis of Claimant's hypothyroidism is supported by substantial evidence.

27

### 3. Primary biliary cirrhosis/fatty liver and hyperlipidemia

The ALJ discussed that, despite Claimant's diagnoses of primary biliary cirrhosis/fatty liver and hyperlipidemia, she did not receive any sustained or advanced treatment for the conditions or have longitudinal signs or symptoms of the diseases, and her liver function tests were normal. (Tr. at 20). The record corroborates the ALJ's analysis. Claimant reported in September 2011 that she was recently diagnosed with primary biliary cirrhosis. (Tr. at 1084). In September 2013, her skin was not jaundiced, and her liver was normal to palpation. (Tr. at 1179, 1181). Her gastroenterologist documented in June and October 2017 that she tolerated medication for the condition "very well" and her liver function tests were normal. (Tr. at 1680, 2028). She also took medication for high cholesterol without any apparent side effects. (Tr. at 1110, 1631). The record did not reflect any significant symptoms or limitations stemming from these conditions. Therefore, the undersigned **FINDS** that the ALJ's step two analysis of Claimant's primary biliary cirrhosis/fatty liver and hyperlipidemia is supported by substantial evidence.

### 4. Dysphagia

The ALJ discussed that Claimant's dysphagia was noted to primarily occur when Claimant consumed hard foods and medication tablets. (Tr. at 21). The ALJ remarked that Claimant was prescribed medication for the esophageal spasm and advised to eat a diet of soft foods, and the condition was described as intermittent and mild. (*Id.*). Reviewing the record, the evidence substantially supports the ALJ's conclusion that this condition was non-severe. Claimant complained of difficulty swallowing, but she denied abdominal pain, bloating, cramps, nausea, vomiting, diarrhea, or constipation. (Tr. at 1149, 2027, 2031). She was treated with medications. (Tr. at 1690, 2034). There was no

indication of any significant symptoms that would impact her ability to perform basic work activities. While Claimant testified that she lost weight due to dysphagia, at other times she attributed her weight loss to stress, depression, and trying to lose weight. (Tr. at 85-86, 102, 129). In 2019, she stated that her weight loss was due to taking Lasix. (Tr. at 61). Claimant weighed 267 pounds even after the significant weight loss. (*Id*.). There were no other documented significant signs or symptoms of the condition. Therefore, the undersigned **FINDS** that the ALJ's step two analysis of Claimant's dysphagia is supported by substantial evidence.

### 5. Allergies

Concerning Claimant's allergies, the ALJ noted that the condition was managed conservatively with medication and treated with steroids during exacerbations. (Tr. at 20). The ALJ discussed that Claimant often had no symptoms on medications, and her allergic rhinitis was described as well-controlled. (*Id*.). A review of the record indicates that Claimant experienced intermittent exacerbations of allergy symptoms, but she otherwise remained symptom-free on her allergy medications. (Tr. at 902, 1110, 1114, 1126, 1231, 1239, 1267, 1271, 1277, 1916, 1925, 1930, 2072, 2075, 2081, 2108). No serious complications were ever documented, and no more significant interventions than medication were recommended. (*Id*.). Therefore, the undersigned **FINDS** that the ALJ's step two analysis of Claimant's allergies is supported by substantial evidence.

### 6. GERD

Regarding Claimant's GERD, the ALJ discussed that Claimant's treatment records reflected that Claimant did not have any symptoms on medication, she did not have any "alarm" symptoms, and her condition was described as well-controlled. (Tr. at 20). Indeed, Claimant's clinical records consistently documented that her GERD was well-

29

controlled and asymptomatic. (Tr. at 1048, 1084, 1114, 1126, 1277, 1453, 1680, 1724, 1925, 2028). Therefore, the undersigned **FINDS** that the ALJ's step two analysis of Claimant's GERD is supported by substantial evidence.

### 7.  Heel spur and plantar fasciitis

The ALJ found that Claimant's heel spur and plantar fasciitis were non-severe impairments because her records routinely documented her normal gait; Claimant's statements indicated that she drove, which involved substantial use of her right leg and foot; and there was no indication in the record of longitudinal complications related to her plantar fasciitis and the condition was resolved as of August 2014. (Tr. at 21). This analysis is supported by substantial evidence. Claimant was diagnosed with plantar fasciitis in July 2014 and advised to stretch at home, ice her heel, and wear supportive shoes. (Tr. at 1250). The condition was resolved by August 26, 2014. (Tr. at 1722). X-rays in June 2016 showed bilateral calcaneal spurts. (Tr. at 3892). However, Claimant had a normal gait in 2017, and she drove a motor vehicle through 2018. (Tr. at 86, 104, 1889, 2004, 2032, 2108). The records cited by Claimant in no way dispute the ALJ's analysis that these impairments were non-severe. (ECF No. 9 at 5). The impairments were mentioned minimally in the record, and there is no evidence that they more than minimally impaired Claimant's ability to walk or perform other basic work activities. Therefore, the undersigned **FINDS** that the ALJ's step two analysis of Claimant's heel spur and plantar fasciitis is supported by substantial evidence.

### 8.  IBS and gastritis

Turning to Claimant's IBS and gastritis, the ALJ noted that Claimant testified that her IBS was controlled with medication and treatment records described medications as being "very helpful." (Tr. at 20). In addition, the ALJ discussed that Claimant's abdominal

examinations were routinely normal, and she generally denied gastrointestinal symptoms, such as nausea and vomiting. (*Id.*). Reviewing the record, Claimant told her medical provider in December 2009 that her IBS sometimes "act[ed] up" in the evening. (Tr. at 1051). However, she stated that a second dose of Bentyl significantly helped. (*Id.*). She again advised the provider in October 2010 that Bentyl was very helpful for IBS. (Tr. at 1065). She denied abdominal pain, nausea, vomiting, and diarrhea in October 2011. (Tr. at 1090). In February 2013, Claimant reported that she still had ten loose stools per day, but less cramping due to Bentyl, and she had no side effects from the medication. (Tr. at 1144). Her gastritis was controlled. (Tr. at 1453). In 2017, Claimant testified that her IBS was controlled with medication, and she denied abdominal pain, nausea, or vomiting. (Tr. at 117, 1842). In 2018, Claimant denied nausea, diarrhea, constipation. (Tr. at 2108).

Overall, while Claimant endorsed significant symptoms and limitations related to her urinary incontinence, she did not complain of any severe problems associated with IBS or gastritis. Rather, the record very clearly indicated that the conditions were controlled with medications, and they did not exhibit more than minimal symptoms or limitations. Therefore, the undersigned **FINDS** that the ALJ's step two analysis of Claimant's IBS and gastritis is supported by substantial evidence.

### 9. Venous insufficiency/edema

The ALJ discussed that Claimant's workup for venous insufficiency was negative, and Claimant was routinely negative for edema. (Tr. at 20). The ALJ also considered the fact that, although Claimant noted that she elevated her feet in the evening, she did not do so as much during the day, and her gait was generally described as normal. (*Id.*). The ALJ's analysis is corroborated by the record. Claimant had no edema at numerous visits

31

in 2013. (Tr. at 1181, 1185, 1198). In July 2014, she complained of worsening pitting edema, which was believed to be related to venous insufficiency due to her morbid obesity. (Tr. at 1247-49). She was prescribed Lasix and compression stockings. (Tr. at 1249). However, Claimant's workup for venous insufficiency was negative. (Tr. at 1239). Claimant was negative for edema in April 2014. (Tr. at 1359). In 2015, Claimant reported that her edema was only occurring intermittently. (Tr. at 1226, 1631). She had +1 edema in June 2016, but her gait was repeatedly described as normal in 2017. (Tr. at 1889, 2004, 2032). In September 2018, Claimant had no edema and normal gait. (Tr. at 2108). Therefore, there was more than scintilla of evidence to support the ALJ's analysis that Claimant's venous insufficiency and edema did not have more than a minimal effect on her ability to do basic work activities. Therefore, the undersigned **FINDS** that the ALJ's step two analysis of Claimant's venous insufficiency and edema is supported by substantial evidence.

### 10. Hip pain

Lastly, the ALJ found that Claimant's hip pain was not a medically determinable impairment. The ALJ explained that, although there was a noted diagnosis, it was not based on clinical findings. (Tr. at 21). Furthermore, the ALJ noted that, even if the impairment was medically determinable, the record did not describe longitudinal signs, symptoms, or complications related to the condition, and hip pain was accounted for in Claimant's RFC restriction to light level exertion. (*Id.*). In determining whether substantial evidence supports the ALJ's findings, there is very little evidence concerning hip pain in the record. At times, Claimant reported pain elicited by motion in her left hip. (Tr. at 1229, 1233, 1241, 1634). However, there was no tenderness to palpation, and she had normal range of motion and no muscle weakness or spasm. (*Id.*). Therefore, the

undersigned **FINDS** that the ALJ's step two analysis of Claimant's hip pain is supported by substantial evidence.

### B. Weight of Opinions

Claimant argues that the ALJ improperly weighed the medical opinions of her treating providers: Dr. Craig, Dr. Bolinger, and Nurse Adkins. When evaluating a claimant's application for benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. §§ 404.1527(b), 416.927(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* §§ 404.1527(a)(2), 416.927(a)(2).

The regulations outline how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. In general, an ALJ should allocate more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* §§ 404.1527(c)(1), 416.927(c)(1). Even greater weight should be given to the opinion of a treating physician, because that physician is usually most able to provide a detailed, longitudinal picture of a claimant's alleged disability. *Id.* §§ 404.1527(c)(2), 416.927(c)(2). Indeed, a treating physician's opinion should be given ***controlling*** weight[2] when the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other

---

[2] The special deference afforded to the opinion of a treating physician, often called the "treating physician rule," was eliminated for claims filed on or after March 27, 2017. 20 C.F.R. §§ 404.1520c, § 416.920c; *Rescission of Soc. Sec. Rulings 96-2p, 96-5p, & 06-3p*, 2017 WL 3928298 (S.S.A. Mar. 27, 2017). However, Claimant's applications were filed in 2011, and the treating physician rule applied to her claims.

substantial evidence. *Id.*

If the ALJ determines that a treating physician's opinion is not entitled to controlling weight, the ALJ must then analyze and weigh all the medical opinions of record, taking into account certain factors listed in 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6), and must explain the reasons for the weight given to the opinions.[3] "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected ... In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *4. Nevertheless, in appropriate circumstances, a treating physician's opinion may be rejected in whole or in part in favor of a conflicting opinion by a non-treating source; for example, when the non-treating source's opinion is well-supported by evidence and explanation, is more consistent with the record as a whole, and is offered by a source with specialization in the subject matter of the opinion. *See Brown v. Commissioner of Soc. Sec.*, 873 F.3d 251, 268 (4th Cir. 2017). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.

Medical source statements on issues reserved to the Commissioner are treated differently than other medical source opinions. SSR 96-5p, 1996 WL 374183. In both the regulations and SSR 96-5p, the SSA explains that "some issues are not medical issues

---

[3] The factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors bearing on the weight of the opinion.

regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability," including the following:

> 1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;
>
> 2. What an individual's RFC is;
>
> 3. Whether an individual's RFC prevents him or her from doing past relevant work;
>
> 4. How the vocational factors of age, education, and work experience apply; and
>
> 5. Whether an individual is "disabled" under the Act.

*Id.* at *2. "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* Consequently, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." *Id.* at *2. Still, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at *3.

### 1. Dr. Craig

Regarding Dr. Craig's opinion that Claimant was totally disabled and incapable of maintaining any gainful employment, the ALJ noted that it was not a medical opinion, but an opinion on an issue reserved to the Commissioner. (Tr. at 34-35). The ALJ considered the opinion, but he gave it little weight because it failed to express Claimant's

functioning in terms of specific limitations, such as how often Claimant could sit, stand, lift, or carry, and because it was inconsistent with the objective evidence of record. (Tr. at 35).

Claimant argues that the ALJ did not consider or assign weight to Dr. Craig's opinions that she could not work. (ECF Nos. 9 at 4, 13 at 2). However, Claimant's assertion is unequivocally incorrect. The ALJ fully complied with the law, acknowledging that the disabling opinions concerned an issue reserved to the Commissioner, and were not subject to the typical analysis afforded to medical source statements. Yet, the ALJ did not ignore the opinions. The ALJ assessed their supportability and consistency with the record as a whole, specifically as the applicable rules and regulations instructed him to do.

The record supports the ALJ's assessment that the disabling opinions were entitled to little weight because they were unsupported and inconsistent with the record. Dr. Craig's opinion that Claimant was totally disabled was rendered on March 28, 2016. As late as September 2018, Claimant had no edema, normal gait, and full range of motion and body strength. (Tr. at 2108). Therefore, the ALJ appropriately concluded that the opinion that Claimant could not work and was disabled was inconsistent with the medical evidence. In addition, Dr. Craig did not provide any support for his disabling opinions, such as reference or citations to objective test results and physical examinations, nor did he explain it in terms of specific functional limitations. As the ALJ explained, Dr. Craig's statements that Claimant could not work and was disabled were starkly inconsistent with the largely normal physical and neurological examinations, including intact range of motion and normal gait, as well as the range of Claimant's reported activities.

Therefore, the undersigned **FINDS** that the ALJ properly considered Dr. Craig's

opinions, and the ALJ's assessment of the opinions is supported by substantial evidence.

### 2. Dr. Bolinger

The ALJ gave little weight to Dr. Bolinger's July 25, 2017 opinion that Claimant was "unable to work" for the same reasons as he gave little weight to Dr. Craig's disabling opinions. The ALJ stated that Dr. Bolinger's opinion did not assess any specific functional limitations and it was inconsistent with the objective evidence in the record. (Tr. at 34-35). This analysis is also supported by substantial evidence. Dr. Bolinger's opinion did not express any functional limitations. (Tr. at 1747). Moreover, it did not provide any insight into the medical conditions, signs, or symptoms that informed Dr. Bolinger's opinion that Claimant could not work. (*Id.*). Dr. Bolinger did not reference examination findings, objective testing, or any evidence whatsoever that supported his disabling opinion. (*Id.*).

Furthermore, the disabling opinion was inconsistent with the evidence, including Dr. Bolinger's own treatment records. On the same date that Dr. Bolinger authored the disabling opinion, he examined Claimant. Claimant suffered from allergies, COPD, osteoarthritis, right ankle pain, and a yeast infection. (Tr. at 1914). On examination, Claimant had some fluid in her middle ear, but an intact eardrum, normal breath and voice sounds, no wheezing, a normal eye examination, and a euthymic mood with normal affect. (Tr. at 1913-14). She was using a cane due to her right ankle and foot pain, but she had full range of motion in all extremities. (Tr. at 1911, 1913). Dr. Bolinger referred Claimant to an orthopedist; prescribed an inhaler for COPD, Flonase for allergies, an antifungal medication for Claimant's yeast infection; and continued Claimant on her current medication regiment for osteoarthritis because Claimant's symptoms were stable. (Tr. at 1914). It is unapparent from this clinical record or Dr. Bolinger's other treatment records the basis for his opinion that Claimant was entirely unable to work.

For all of the above reasons, the undersigned **FINDS** that the ALJ properly considered Dr. Bolinger's opinion, and the ALJ's assessment of the opinion is supported by substantial evidence.

### 3.  Nurse Adkins

Lastly, Claimant argues that the ALJ did not properly consider the opinion of her mental health provider, Nurse Adkins. Nurse Adkins completed a form assessing Claimant's mental ability to do work-related activities on October 7, 2015. She assessed that Claimant had significant depression, but Claimant's prognosis was good with medication and therapy. (Tr. at 1566). She opined that Claimant was moderately limited in completing all of the listed work-related activities. (Tr. at 1567). She further assessed that Claimant had marked-to-extreme pervasive loss of interest in almost all activities, decreased energy, mood disturbance, and persistent disturbances of mood or affect. (*Id*.).

The ALJ considered Nurse Adkins' opinion, but ultimately accorded it little weight. (Tr. at 30). The ALJ explained that Nurse Adkins' assessment of marked and extreme limitations in Claimant's mental functioning was inconsistent with Claimant's conservative treatment and routinely normal mental status findings. (*Id*.). The ALJ noted that Nurse Adkins also listed Claimant's "extremely low energy" as a basis for restrictions, which the ALJ found to be inconsistent with the evidence that Claimant routinely denied fatigue and malaise. (*Id*.). In addition, Nurse Adkins assessed extreme limitations stemming from Claimant's anxiety, although Claimant stated that her anxiety did not interfere with her daily functioning. (Tr. at 33-34). The ALJ discussed Claimant's function report in which Claimant stated that she got along well with others, including authority figures, and could independently perform self-care, pay bills, manage finances, go shopping, and drive. (Tr. at 30).

38

The foregoing analysis is supported by substantial evidence. Despite Claimant's mental impairments, Claimant's mental status examinations were largely normal, and she routinely presented with a normal mood and affect and denied fatigue or malaise. (Tr. at 945-47, 1067, 1084, 1103, 1113, 1117, 1120, 1129, 1147, 1153, 1229, 1234, 1283, 1294, 1536-37, 1586, 1789-90, 2032, 2097-98, 2108, 3270). Claimant appeared for her medical appointments and interacted with her medical providers without any apparent issues. She performed activities such as light cleaning; watching television; reading; performing self-care independently; cooking simple meals; driving; shopping; handling her finances; and using the computer to play games, browse the internet, and interact with others. (Tr. at 1106). Moreover, the ALJ gave considerable weight to Claimant's consultative mental examination performed by Ms. Arthur, a psychologist hired by Claimant, and he gave great weight to Dr. Fremont's June 2015 opinion regarding Claimant's mental functional abilities. (Tr. at 32, 34). The ALJ explained, with specific citations to the record, that Ms. Arthur's opinion was supported by her examination findings, as well as Claimant's treatment records and function reports. (Tr. at 34). Likewise, the ALJ discussed that Dr. Fremont's opinion related to his area of expertise, was supported with specific citations to the record, and was consistent with the longitudinal evidence. (Tr. at 32).

For the above reasons, the undersigned **FINDS** that the ALJ properly considered Nurse Adkins' opinion, and the ALJ's assessment of the opinion is supported by substantial evidence.

### C. Obesity

Claimant next contends that the ALJ failed to properly evaluate the impact of her obesity on her ability to work. (ECF No. 9 at 6). Obesity is identified as a medically determinable impairment and generally addressed by SSR 02–1P, 2002 WL 34686281,

at *1. The Ruling identifies four ways obesity may be considered in the sequential evaluation process. It may be considered in determining whether the individual has a medically determinable impairment; whether the individual's impairment is severe; whether the individual's impairment meets or equals the requirements of a listing; and whether the individual's impairments prevent her from doing her past relevant work or other work existing in significant numbers in the national economy. *Id.* at *3. The Ruling provides that "[w]hen establishing the existence of obesity, [the SSA] will generally rely on the judgment of a physician who has examined the claimant and reported his or her appearance and build, as well as weight and height." *Id.* Therefore, "in the absence of evidence to the contrary in the case record, [the SSA] will accept a diagnosis of obesity given by a treating source or by a consultative examiner." *Id.*

In considering obesity at step two of the sequential evaluation, "[t]here is no specific level of weight or BMI that equates with a 'severe' or a 'not severe' impairment," and "[n]either do descriptive terms for levels of obesity (e.g., 'severe,' 'extreme,' or 'morbid' obesity) establish whether obesity is or is not a 'severe' impairment for disability program purposes." *Id.* at *4. Ultimately, the SSA conducts an individualized assessment of an individual's obesity in determining whether an individual's obesity impacts his or her functioning to the degree that a finding of "severe" is appropriate. *Id.*

When evaluating obesity under the Listing at step three of the sequential evaluation, the SSA will not make assumptions "about the severity or functional effects of obesity combined with other impairments." *Id.* at *6. The SSA will not make such assumptions because "[o]besity in combination with impairment may or may not increase the severity or functional limitations of the other impairments." *Id.* Therefore, in each case, an individualized determination of a claimant's functional limitations as a result of

obesity will be made based on the medical record. *Id.*

At steps four and five of the sequential evaluation, the SSA assesses the residual functional capacity of a claimant. The SSA recognizes that "[o]besity can cause limitation of function." *Id.* at *6. Specifically, as a result of obesity:

> An individual may have limitations in any of the exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling. It may also affect ability to do postural functions, such as climbing, balance, stooping, and crouching. The ability to manipulate may be affected by the presence of adipose (fatty) tissue in the hands and fingers. The ability to tolerate extreme heat, humidity, or hazards may also be affected.

*Id.* The SSA must take this into consideration when completing an individualized assessment of a claimant's residual functional capacity. Ultimately, the SSA "will explain how [it] reached [its] conclusions on whether obesity caused any physical or mental limitations" with respect to a claimant's residual functional capacity. *Id.* at *7.

In this case, the ALJ found that Claimant's morbid obesity was a severe impairment. (Tr. at 19). At step three of the sequential process, the ALJ cited SSR 02-1P and considered Claimant's obesity when evaluating the listings. (Tr. at 24). In the RFC analysis, the ALJ discussed the medical evidence at length, specifically referencing Claimant's obesity and SSR 02-1p. (Tr. at 24-35). The ALJ explained that he considered the impact of Claimant's obesity on her ability to sit, stand, walk, perform postural activities, and tolerate environmental factors. (Tr. at 35). The ALJ assessed that a restriction to light work, which involved sitting for a maximum of four hours at one time, standing or walking for one hour at one time, never climbing ladders or scaffolds or crawling, and numerous other limitations adequately accounted for her obesity. (*Id.*).

It is evident from the decision that the ALJ considered Claimant's obesity in deciding Claimant's RFC and understood that he was required to evaluate Claimant's

obesity in light of SSR 02-1p. Moreover, the ALJ included RFC limitations to account for Claimant's obesity, including restricting her ability to lift, sit, walk, stand, crawl, climb, balance, and be exposed to environmental conditions. (Tr. at 24). The undersigned **FINDS** that the ALJ properly considered Claimant's obesity in accordance with the applicable rules and regulations.

### D. VE Testimony

Claimant argues that the ALJ should have adopted the testimony of the VE, which indicated that Claimant could not work if she was absent from work two or more days per month or off-task 15 percent or more of the workday. (ECF No. 9 at 7). In order for a vocational expert's opinion to be relevant, it must be in response to a proper hypothetical question that sets forth all of the claimant's impairments. *English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir. 1993); *Walker v. Bowen*, 889 F.2d 47, 50-51 (4th Cir. 1989). To frame a proper hypothetical question, the ALJ must first translate the claimant's physical and mental impairments into an RFC that is supported by the evidence; one which adequately reflects the limitations imposed by the claimant's impairments. *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006). "[I]t is the claimant's functional capacity, not his clinical impairments, that the ALJ must relate to the vocational expert." *Fisher v. Barnhart,* 181 F. App'x 359, 364 (4th Cir. 2006). A hypothetical question will be "unimpeachable if it adequately reflects a residual functional capacity for which the ALJ had sufficient evidence." *Id.* (citing *Johnson v. Barnhart,* 434 F.3d 650, 659 (4th Cir. 2005)) (internal quotation marks omitted); *see also Russell v. Barnhart*, 58 F. App'x 25, 30 (4th Cir. 2003) (noting that hypothetical question "need only reflect those impairments supported by the record"). However, "[t]he Commissioner can show that the claimant is not disabled only if the vocational expert's testimony that jobs exist in the national economy is in response

to questions from the ALJ that accurately reflect the claimant's work-related abilities." *Morgan v. Barnhart*, 142 F. App'x 716, 720-21 (4th Cir. 2005).

In this matter, the ALJ posed a series of hypothetical questions to the VE at Claimant's administrative hearing. First, the ALJ questioned whether there were any jobs that could be performed by someone with Claimant's characteristics and RFC, and the VE responded that the person could perform Claimant's past relevant work as well as other jobs. (Tr. at 68-69). In response to Claimant's counsel's questioning, the VE stated that a person could not maintain competitive employment if absent from work two or more days per month or off-task 15 percent or more of the workday. (Tr. at 72).

Claimant indicates that the ALJ should have accepted this testimony and concluded that she was disabled. However, Claimant does not demonstrate that either of those restrictions was warranted. Claimant's only asserted basis for the restrictions is her urinary incontinence. A review of the record establishes that the ALJ thoroughly evaluated the medical evidence concerning that condition. (Tr. at 25, 27, 29). The ALJ found that Claimant's urinary incontinence was a severe impairment, but he did not find that any further restrictions were warranted. (Tr. at 19, 36). The ALJ noted that, despite Claimant's allegations regarding the severity and limiting effects of her incontinence, her records in 2010 through 2014 noted that Claimant was negative for incontinence on various occasions. (Tr. at 29). The ALJ found that Claimant's subsequent records were inconsistent with her allegations of pervasive symptoms and accidents throughout the day. (*Id.*). In addition, the ALJ noted that Claimant received substantial benefit from her InterStim device, and although it was later removed, her medical conditions were described as being under "reasonable control" in 2018. (*Id.*).

This assessment is supported by substantial evidence. In April 2014, Claimant

reported suffering from incontinence and overactive bladder over the past year. (Tr. at 1357). She used pads and pull-ups for protection. (Tr. at 1364). Claimant did not notice much improvement from medications, and Dr. Morabito noted that Claimant would not likely benefit from typical therapies due to her morbid obesity. (*Id.*). Therefore, Claimant was implanted with a trial InterStim electrical impulse device in August 2014. (Tr. at 1374). The trial was successful in improving Claimant's symptoms and Claimant was implanted with a permanent device in September 2014. (Tr. at 1382). Claimant reported that she "thought she was better" and was satisfied. (Tr. at 1387, 1412). However, Claimant's device eventually stopped functioning correctly. She reported poor symptom control to Dr. Conaway in October 2016. (Tr. at 1754). Dr. Woolums turned off Claimant's device in November 2016 and removed it in March 2017. (Tr. at 1884, 1909). There was substantial support for the ALJ's assessment that Claimant's urinary incontinence did not pose any more severe limitations than he assessed, such as excessive work absences or time spent off-task. Claimant maintained the daily activities previously discussed despite her urinary incontinence, and she attended her frequent medical appointments without any noted issues. Although she did mention urinary symptoms at subsequent appointments, there was no significant intervention or emphasis in her medical records. As the ALJ mentioned, Claimant's chronic medical conditions were described as being under reasonable control in 2018. (Tr. at 4657).

Therefore, while Claimant disagrees with the ALJ's findings related to her urinary incontinence, she does not offer any argument or evidence to undermine his conclusion that Claimant could remain on task and maintain work attendance within customary tolerances notwithstanding her condition. Claimant does not cite to any critical evidence that the ALJ neglected to consider that would indicate that her urinary incontinence

44

would cause her to miss work or be off-task at the frequency that would preclude employment. Therefore, there was no justification for the ALJ to rely on the VE's responses to the hypothetical questions that included those limitations. For the stated reasons, the ALJ's analysis of the impairment is supported by substantial evidence. Accordingly, the undersigned **FINDS** that the ALJ properly relied on the VE's testimony at step five of the sequential evaluation.

### E.  Prior ALJ's RFC Finding

Claimant's final challenge to the ALJ's decision asserts that the ALJ failed to properly consider ALJ Harris' finding that Claimant was capable of less than a full range of sedentary work. (ECF No. 9 at 7-8). The ALJ considered the prior ALJ's decision dated August 10, 2012. (Tr. at 30). However, the ALJ noted that the prior decision was vacated and remanded. (*Id*.). Acquiescence Ruling 00-1(4) provides that the SSA must consider the RFC in a prior *final* decision by an ALJ or the Appeals Council. *See* www.ssa.gov/OP_Home/rulings/ar/04/AR2000-01-ar-04.html. The Commissioner argues that ALJ Harris' decision was not final because it was remanded by the Appeals Council for further proceedings.

Nevertheless, the ALJ considered the prior RFC assessment and gave it little weight because he found that it was not supported by the objective evidence in the record. The ALJ noted that the prior RFC assessment was not based on a single piece of opinion evidence. (*Id*.). In addition, the ALJ discussed in exacting detail how each of the limitations that the prior ALJ assessed were unexplained and unsupported by the record. (Tr. at 31). Claimant's only specific challenge to the ALJ's consideration of the prior RFC finding is that the ALJ did not fairly assess the vocational impact of her need for frequent restroom breaks and unfairly minimized the impact of her urinary incontinence. (ECF No.

9 at 8). However, as discussed above, the ALJ fully considered the effects of Claimant's urinary incontinence. For those reasons, the undersigned **FINDS** that the ALJ's consideration of the prior ALJ's RFC finding is supported by substantial evidence.

## VIII.   <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF Nos. 9); **GRANT** the Commissioner's request for judgment on the pleadings, (ECF No. 12); **AFFIRM** the decision of the Commissioner; **DISMISS** this action, with prejudice, and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Thomas v. Arn*, 474 U.S. 140 (1985); *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727

F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers, and Magistrate Judge Eifert.

 The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

 **FILED**:  September 4, 2020

Cheryl A. Eifert
United States Magistrate Judge